Good morning. May it please the Court, my name is Kari Hong. Along with my co-counsel Kara Hartzler, I represent petitioner Joseph Anderson. There are five areas of substantial disagreement between the parties. On the first area, the BIA, there was a question about whether a blood tie is a precondition when there is a legitimate child seeking derivative citizenship. The BIA said that there was a blood requirement, but not under the INA, not under 1409. It correctly recognized that this is a pre-1986 case for which a blood requirement is not required for 1409. The BIA, however, looked at the legitimation statutes presented by California, Arizona, and the Philippines and said we will write in a biological requirement into the state and foreign jurisdictions, and we contend that Mr. Anderson has not been legitimated. Our position is that that is error because the plain meaning of the California statute does not require a blood tie. The Arizona statute does not require a blood tie. The Philippines does not require a blood tie. On that basis alone, the BIA decisions can be reversed. The second area of disagreement is that the BIA says there is a dispute over paternity. It says there is a dispute because although Officer Anderson signed the birth certificate, signed an affidavit of paternity, and proceeded to raise Mr. Anderson as his son, the dispute is at one point when Officer Anderson was being transferred among his posts from the Philippines to Japan, he needed to take his family with him, and he was asked whether Mr. Anderson, three and a half years old at the time, was his son, at which point he answered, we don't know, and mentioned his wife's situation. They said it's unknown, but for the purposes to make sure that my family stays with me in this transfer, I will say fine, he's a stepson, let's bring him across. So the record is mixed on whether he was his son or his stepson or either. Well, that's what the BIA says. What's interesting is under scales, the Ninth Circuit had an analogous situation  and during his transfer made a similar statement and went one step beyond where he executed an agreement or a statement of non-paternity, and the Ninth Circuit said that can't overcome presumption of legitimacy that was conferred by Washington State. We're saying on this level alone, the BIA's presumption of the statement in another context is not solid evidence to undo the legitimation statutes under California, Arizona, and the Philippines law. That's the second basis by which this Court can resolve this issue. On the third issue, there's a question of what is the significance of the precedent of Martinez-Madeira, the Supreme Court case Miller, and the Ninth Circuit-Margaux-Palato. These cases deal primarily with 1401 or, in Miller, the question of an illegitimate child under 1409. In Miller, that child did not know her father. She petitioned to become a citizen even though she had no contact with her father, and although she had established paternity, she never established legitimation. Now, the BIA recognizes that when there's a legitimate child, only legitimation is required and blood is not. So Miller does not control this case. Martinez-Madeira asks the question of whether marriage is relevant for 1401 to apply. Once again, our contention is that under 1409, in the pre-1986 version, blood is not required. Okay, so let me ask you whether the BIA correctly concluded that your client was eligible under the pre- I guess the old version of 1409, which did not explicitly require a blood relationship. Yes. We contend that that is correct. Right. But is it in fact correct? I mean, when was your client born? He was born before, I think, 1971. But let me check the brief. But it definitely was before 1986, and that was never disputed at any earlier proceeding. So I'm just trying to trace this back, because I actually think that we have some law now in the Ninth Circuit that relies on, I think it was Gales, to incorrectly hold that the old version required a blood relationship when, in fact, it didn't, and it was added in the new version. So I want to be very, very clear which version applies to your client. It is the pre-1986, and actually on page 6 of her brief, December 8th, 1974, and his birth certificate is in the record at 320. And, Your Honor, that points up to another point as to why Martinez-Madeira is not on point, is that it incorrectly cites the post-1986 version in footnote 1. It cites the version that requires under subsection A a blood tie. So its dicta in 1409 is not binding on this Court, because it was an improper application of the wrong law to that facsimile case. Okay. So where is the statute that says that if he's born on December 8th, 1974, he can elect to apply the old version? What are you pointing me to on that? Well, that was not in dispute. That was under the BIA decision itself, where it's in the footnotes. I think it's footnote 1 or 2. Actually, the BIA decision has footnote 1. It says, depending on his birth date, child born out of wedlock, a U.S. citizen father may elect to have the amended version of 309 apply or its prior version. And so we contend that footnote 1 of the BIA decision is the proper and the correct application of the pre-1986 law, which binds this case. So that means – but what is the standard for that? That the Petitioner gets to choose. No, I understand that. But I'm saying what is it substantively that allows him to select the old Section 309? The date of his birth. So you're saying if he was born or is it whether he was born or whether he was legitimized before November 14, 1986? You know, Your Honor, I am not positive. He needs both standards because that was in dispute. I cannot recall. I can submit a supplemental version, but under either showing he was born. No, that's all right. I don't think the government contests that he can elect in this case. And now the fourth area of dispute is the legitimation. And this, I think, is a critical difference, is that the government contends that legitimation is a factual question. They look at what happened. And if Mr. Anderson was born to an unwed mother at the time of his birth, he forever is illegitimate. Legitimation statutes, however, are a legal question and a legal process. They contend that once an adult meets certain preconditions that they have attached to the obligations and responsibilities of parenthood to that child. And as a part of that benefit, the child receives the benefit of the legal fiction that they were legitimated at the time of the birth. This is recognized under the state legitimation statutes. This is recognized under the INA. Under 1409 itself, it contends as long as the legitimation occurs by age 21, the benefits of legitimation will be conferred to that child from the moment of birth. And now the fifth issue of disagreement is the conviction documents. Are there any questions on the citizenship, or if the Court has no objections, I'll go to the conviction documents, which would apply if the Court disagrees with our citizenship analysis. Well, what do you do with our case law that says that the old version of 1409 required a blood relationship? Well, Martinez Madera said that in dicta, and its citation was to the post-1986 statute, so that was air. Margot Collado did not even address the question of whether legitimation occurred. In that situation, the set father did not make steps under state law and did not argue that state law trumped that. So factually, our situation's different where Officer Anderson signed the birth certificate, and because there's a legitimation issue, that applies. And that was, the BIA does not dispute that legitimation can derive citizenship. It just argues that the state law required this requirement, that this requirement is under state law when in fact it's not. Well, the birth certificate shows Anderson is the father. Correct. And then, didn't he sign a legitimation paper? Paternity, an affidavit of paternity. Affidavit of paternity, which is the same. He signed that under California law? He signed it in the Philippines at the time of his son's birth. In the Philippines. But under California law and Arizona law, that's dispositive evidence of both paternity and legitimation. Okay. And Judge Ward? And then when he applied for a visa, when he was traveling, they were moving from the Philippines to, I think, Yokota Air Base, Japan. Not to delay getting the visa, this is what he said. He wrote down that the child was his stepchild. Because he didn't have time for the blood test. He didn't have time for what? He did not have time to conduct the blood test at that time. You're correct. He wanted his family to move with him. He didn't want to be separated from his family. Well, who required the blood test? At the INS, when he and his wife said that, we don't know for certain. No, he was in the military service. Correct. What base was he in in the Philippines? I can't recall the exact place. So he's moving to Yokota Air Base, Japan. And so the government officials who were working with that transfer, they told him, if this is your biological son, you can transfer together. If this is your stepson, and the paternity isn't known, you can transfer him. But if there's a doubt, you have to take a blood test so we know whether he's your biological son or not. And he wanted his family to stay together, and so he just said, he's a stepson, and we'll go ahead and move. So they asked him if there's a doubt? Yes, they did. And so what did he say? There was a doubt? He did because one of the questions of admissibility for his wife was whether she's a prostitute, and she said that she was because she was a hostess service member in the Philippines. And she said she was. Correct. However, that points, I think, in answer to Judge Wardlaw's question, is that in Martinez-Madeira and in Margot Palado, it was clear that there was an unknown Mexican citizen who was the biological father. There is a chance that Officer Anderson is the biological father of Mr. Anderson. And that is a key difference, which we contend shows that there is an dispute. Is there a feasible way of verifying paternity at this point, given that the father is deceased? Mr. Anderson would have the financial burden to exhume the body of his father for DNA testing. And Mr. Anderson didn't elect to do that for the emotional and the psychological impact that would have on his mother and two other brothers. But also, Mr. Anderson expressed concern that he, too, holds on to the chance that his father is his biological father. And for him, the psychological advantages of having that tie was more important to him to have that test, especially since under the pre-1986 law, he only required legitimation. Now, if this were a post-1986 law, he would have to prove a blood tie, and he would be forced to do that. I think our last case on this point, which I think is wrongly decided, but it's nonetheless there, says, Margot Pallado says that the old version required a blood relationship. In Margot Pallado, however, there wasn't a question of legitimation, so they weren't trying to get in 1409 to kick into 1401. They were just looking at the status, the marital status, and whether that would require, whether that would be enough to meet 1401. This is a 1401 and 1409 case, and unlike Margot Pallado, the BIA recognizes that a blood tie isn't necessary for the INA, that legitimation is okay for the INA, and that would bring it, that makes it drastically different than that case. So you're saying a blood tie isn't required? Under the pre-1986 case, when there's a legitimate child. When there's an illegitimate child, a blood tie is necessary, and that was the holding of the Supreme Court Miller case, but this is a legitimate child. Because he was legitimated later? Immediately, under the Philippines law. Actually, seven months later, his parents didn't marry each other, so under the Philippines law, he was legitimated at seven months. In California, he was legitimated at the time that he resided in California because of the birth certificate, the paternity, and he held himself out as his father. And under Arizona, the affidavit of paternity was actually adequate to confer a legitimate status. So under all three jurisdictions, although they had different criterion, he met each and every one. And is that the end of our inquiry? Unless there are questions about the conviction, our documents. Did he, your position is that the old law applies, correct? The pre-1986 law applies. Yeah, I call it the old law, pre-86 law. Now, was there a requirement that you be of a certain age in order to elect the old law when the new law took place? In other words, was there a certain age requirement that you had to be in 1986? I'm not aware of any age requirement, no. The only requirement of that law is that the legitimation has to occur before age 21. And that's another difference that happened in the post-1986 law, which is it's 18, but at the time it was 21, and Mr. Anderson met that in spades. So in a nutshell, what is your argument on legitimation? The nutshell is that Mr. Anderson is properly legitimated under three different jurisdictions. The BIA recognized that only legitimation is required to confer a derivative citizenship. However, the BIA erred by saying, looking at each of those three jurisdictions and writing in the blood tie when California, Arizona, and the Philippines do not require a blood tie for those states to confer legitimacy to the child. So we contend it's a state error, a failure to defer state law rather than actually an interpretation of INA that went awry in this case. Okay. Are there any further questions on the conviction documents? Or would you like me to? No, they had the father's blood type when he was in the service. Right? They had the mother's. He must have had. Correct. I don't know whether it's before we knew about DNA and all the rest of it, but though it's not conclusive, depending on their blood types and how things match up, there's an inference of paternity or paternity. Correct. But once again, because legitimation was required, Mr. Anderson did not explore that avenue. There's also a law review that we cited in the reply brief talking about the problems with blood testing under the law, that it wasn't even admissible to courts until 1930s because there was no conclusive scientific proof. And even now, the DNA test, although I don't think that's been favored under California yet, the blood test can only exclude which man would not be a father. But it does not affirmatively identify the father in the way that the DNA testing does. If there are no further questions, may I reserve any remaining time? Okay. Okay. Good morning, Your Honors. May it please the Court. John Blakely on behalf of the Respondent and Attorney General of the United States. Your Honors, there are two different presidential decisions from this Court that are definitive on this issue of whether or not he has established his citizenship. The first we've talked about a little bit, which is the Margot Pilato. The other case is Martinez-Madera. The same situation in both cases. One's a criminal case. The other's an immigration case. But the citizenship issue is the same. And in both cases, this Court found that the blood relationship was required, and both of those decisions were rooted in the Supreme Court decision in Miller where the Supreme Court said that the substantive requirement embodied in 14-09-84, and this is in the old statute, serves at least in part to ensure that a person born out of wedlock who claims citizenship by birth actually shares a blood relationship. So the Supreme Court said the old statute required a blood relationship. The change to the new statute ---- So I think you're over-reading Miller because I don't think Miller was a ---- I mean, it involved a completely different question, and all of this stuff about blood as a rationale, blood relationship was really dicta in Miller and was actually dicta in an opinion. His plurality decision was dicta in an opinion that was signed on by only two justices of the Court and that four other justices didn't even discuss a blood requirement but agreed that the case should be dismissed for two other reasons, and then finally there were three of them that dissented. So I don't really think ---- I'm not going to say that you're wrong substantively, but I really don't think Miller gets you there on his blood evidence. And then we ---- Well ---- The blood relationship. I understand, Your Honor. There's nowhere that this reasoning of the Court here was disputed in any part of the decision. I agree with the ---- Because the other ---- The label of dicta. But again, this Court relied on it in a ---- No, but no, I know. In a presidential decision. That's right. The Court ---- Our Court relied on it in Marget Pilato, which in turn, it relied on the reasoning. But it also, in turn, relied on an earlier decision of our Court that somehow contains an error. I mean, I hate to blame law clerks for this sort of thing, but it says that the old version ---- it cites to the new version of the statute for the proposition that the old version contains the blood relationship. And I can't remember which case that was. It was Scales or something. And it's just a mistake in the opinion that got picked up later because, as you and I both know, the new version expressly added, whereas it was not in the old version. But I guess I have another question for you. Do you dispute the BIA's conclusion that Anderson can go under either the old version or the new version of the statute? There's nothing in dispute there, Your Honor. Okay. So I guess what I'm really confused about, and maybe you can clarify, is if he can go under the old version and if the old version doesn't have that blood requirement explicitly, and just putting aside Marget Pilato's version. Yes, it does. Yes, Your Honor. It doesn't. Does he satisfy the requirements for legitimization or legitimation under the Philippine law, the, you know, California law or the Arizona law? Your Honor, the answer to that is no. He would not be legitimated. But I think it's important to start with the position that that's a question of, in the context of the Philippines, it's a question of foreign law. That needs to be presented to the immigration court as a question of fact. And that wasn't proved. The board analyzed the factual elements of the statute that were put there. This is the Philippine family law statute. And said that that's not sufficient to show that he's legitimated because their interpretation of that, of those facts presented to it, was that it required it to be natural parents, real parents. Somebody who wasn't a parent couldn't legitimate by fraud or otherwise couldn't legitimate a child just because they wanted to. They had to have a biological relationship. That's what the board found. With California, I think it's Martinez-Madera's decision that cites the California Supreme Court decision that says specifically in this sort of situation a blood relationship is required. And so the only question left there is Arizona. And, again, there's nothing to show that in Arizona the legitimation was that Arizona has actually accepted that he was legitimated in the absence of a blood relationship. So none of those things were established to the board's satisfaction. And so he's been unable to establish that he has a blood relationship. He was given the opportunity. This was remanded to say, we know you've been caught off guard here. And we believe that with what you're saying, there's a possibility that there's a blood relationship, given some of the confusion there is in the record. And so they remanded and allowed him to figure it out. He went to his family, and it's very obvious that the response was, we're not going there. And for whatever the reasons for their not going there, they chose not to establish the blood relationship. So the BIA says that he didn't avail himself of the opportunity to have genetic testing, and gives that as one of the reasons in support. But what do we know about what genetic testing could have proved or not proved? Well, he has brothers and sisters. So with DNA testing, they could establish the same heritage. So he wouldn't have to exhume his father's body? He had a brother. Right, Your Honor. As long as they have the same father. Right. And so the DNA testing would establish whether they shared the same father or not. And so for whatever reasons, and no need to go into whatever the reasons are, they chose not to do that. The ultimate answer is they chose not to establish that there's a blood relationship. And their burden of proof here was to establish that they're a citizen. And to do that, they had to establish a blood relationship. So we're at diametrical odds here between the two of you. We just heard that the three jurisdictions did not require it, and you're telling us that the government's position is that each of those three jurisdictions required it. That was the Board's opinion? Yes, Your Honor. And you agree with that? It's the government's position that each of those three jurisdictions require genetic testing? Yes, Your Honor. Maybe a better way to phrase it, it has not been proven to the Board that they do not require it. And with what has been presented to the Board, it's apparent that the blood relationship is required. And then in addition to that, that's just to establish legitimation, and that's the only issue. All of this presumes that by statute, in order to acquire citizenship at birth, you don't have to have a blood relationship, which, again, the government argues that you do, that the statute requires a blood relationship. Does California require a blood relationship? The California Supreme Court has said they require a blood relationship, Your Honor. That's in Martinez, Madera, and that was citing the case of Blythe v. Ayers, 96, California, 532. Isn't there a statute in California that concerns that? There's a statute in California, right? Your Honor, if there is, I'm not familiar with that statute, and it hasn't been presented to the agency as proof that he's been legitimated, and, again, an underlying principle that he has to establish a blood relationship to acquire citizenship at birth. All right. Let me ask you something. Aside from the citizenship, if we were to find that his conviction was not a categorical aggravated felony, what's the result? What would be the result of that finding? Well, categorically, I don't think that there wasn't an issue about whether it's categorically. The issue here was under the modified categorical approach, whether established sufficient evidence. And applying the modified categorical approach here, the Board determined that he was convicted of an aggravated felony because looking at the felony complaint and the felony plea agreement combined, the two documents established that he was convicted of the sale of methamphetamine. Right. Well, suppose we disagree with that. The documents don't establish that. What's the procedural result? If this Court disagrees with that, then this Court should remand the case to the Board for the Board to send it back to the immigration judge for an adjudication of cancellation or removal. Since it's been indicated that that's what you would apply for. His application for cancellation or removal was predetermined because of the aggravated felony. And so he has not yet presented evidence, and so he would have the opportunity to present the evidence. Okay. The plea agreement's pretty weak in this case in the sense that it doesn't give us a lot of facts or details, especially vis-a-vis the complaint, which is broader than the plea. There's no plea hearing in the record, I believe. I looked for it, didn't find it. That's correct, Your Honor. It's not in here. And the language in the form, plea agreement, certainly leaves open some question of whether the defendant is pleading guilty to the key words that are necessary under the Federal statute. I'm struggling with that. Help me out. Well, Your Honor, first, it's important to understand the standard or the burden of proof here. And the burden of proof is established by clear and convincing evidence. The government needs to establish by clear and convincing evidence that he was convicted of an aggravated felony. And so with that, you look at the statute. And comparing the two, it's, I think, in Gonzalez v. Duanez-Alvarez, the Supreme Court addressed the analysis and said that for an alien to make an argument that something that the government says shows that it's an alien to make the argument that there's something else that could have possibly come from this paperwork, in other words, that this really wasn't from methamphetamine, there has to be some sort of realistic probability, this is the language from Duanez-Alvarez, some realistic probability that this was something other than what it appears to be from the record. The documents say in the felony plea form, you have just the count one and the very simple terms of the sale or transport of drugs. It doesn't say meth. It does not say meth. But that felony plea form is necessarily tied to the felony complaint. They refer to the counts in the same way, the counts coincide. The problem is that generally not. I mean, generally the charges are broader than the plea agreement. That's why you get a plea agreement. So the other thing about it, I'm not following your clear and convincing argument, because we have rules that we apply when we're applying the modified categorical approach to crimes, whether it's under the INA or it's for purposes of sentencing. They're the same rules that apply across the board. And it either is an aggravated felony under the modified categorical approach or it's not. There's not like a standard of deference that's in between our review of that to the BIA or to a district court for that matter. But in Nijhuan, the Supreme Court separated out civil proceedings in which you have immigration and criminal proceedings where you have the criminal convictions and said that there was a different standard, that in the criminal cases the government's required to prove beyond a reasonable doubt that they've been convicted previously to establish. In immigration cases, we don't have to, that the government does not have to prove beyond a reasonable doubt that he was convicted here of an aggravated felony. The requirement is clear and convincing evidence. That's the statute. AUSC 1229A, C3A says the government must prove by clear and convincing evidence that the alien is removable. And so that's the standard, and it is different than beyond a reasonable doubt here. And so when you look at the felony plea form and the felony complaint, which clearly reference each other and clearly indicate that there's, or don't provide any indication that there's some other modification to the plea, so there's no reason that you would look at the two documents and think, oh, maybe he was actually convicted of it, maybe he actually pled to something else. There's nothing that says that. Well, isn't, well, all right, I will look into that further. But in my view, it's either it does fall within the, I mean, you can apply whatever standard review you want, but it's either going to fall within it or not fall within it, and that's going to be clear. But when there's a question that's raised here by a set of documents and you have to ask yourself, could this indicate something else? Could there be something else in this plea? And I agree with Judge that if we had the plea colloquy, that would be even better. If we had the minutes, that would be great. And we have other cases where we have all that. For some reason, we don't here, but that doesn't necessarily mean that the government has failed to meet its burden of proof. And for example, the charge is that he pled guilty to sale or transportation of dangerous drugs. Are you required to show that it was actually meth, or is that good enough? Because there's nothing about meth in here. He could have been pleading guilty to something other than meth for the deadly weapon. There's nothing in the plea that says firearm. I know that's part of the charge. The charge is deadly weapon, and the statute says deadly weapons include firearms. But I don't have anything that says meth. I don't have anything that says firearm other than the charge. And the charge alone, I don't believe, is enough. But the plea form is tied to the indictment. The statute. Right. And one reason I say that is because you have count one and you have count five. This is on page 307 of the record. I've got it right in front of me. You have count one and you have count five up on the top. I see that. And then you have ask to count one and ask to count five, and you have that in several different paragraphs. When you get down to paragraph three or box three, it says the following changes are dismissed, counts two, three, and four. This felony plea form doesn't stand alone on what are these counts two, three, and four. The counts two and three and four are provided in the felony indictment on 303 of the record. And so combine that with the numbers, the docket numbers for the case, and it's clear that those two documents go together. And so if an alien wants to come forward and say, no, I know both of those documents say I was convicted of or I know the two documents together say I was convicted of meth, but no, really, there was something else here. But does it have to be sale, transportation, or, I mean, what if it was possession of meth? Your Honor, that hasn't been addressed below. If you're referring to the 28-J letter that was filed in the Rosas-Castanedas decision, the board hasn't analyzed that with respect to this statute. And the government has asked for an extension of time on rehearing for Rosas-Castanedas. And to the extent that this board feels that that decision affects the outcome of this decision, we'd ask that this court hold a decision on that until after the government's rehearing petition or its decision not to seek rehearing. I guess another question would be if we were to remand this on the cancellation question, is there more documentation available? Is there anything else available to inform the determination as to what exactly he admitted to? So are you asking if we go back to the State Court, will they be able to provide more? No, if you go back to the BIA and to evaluate this further. This is the entire record here, Your Honor. To the extent that Rosas-Castanedas would send this back for a different analysis on whether or not he established that it actually was the sale and not the solicitation of the sale, then this should be remanded with the instructions that the record is open. For the government to provide additional documents because of the intervening law that would require additional pleadings or additional proof. Your Honor, I see that I've gone over my time. I'd like to ask you a couple of questions. Where is Mrs. Anderson presently? Your Honor, there's nothing in the record that I remember that gives us her location that I don't know otherwise. As far as we know, is she still living in the United States? I'm inferring from what I've read in the record that she's still here. And there was some discussion in the immigration court about whether or not she was a U.S. citizen because if she had acquired citizenship while he was a minor, then she would have derived citizenship. What we're talking about here is not actually derivative citizenship from the father. That would have been citizenship acquired at birth. If his mother would have naturalized while he was at, I'd have to look at the statute for the time, either 18 or 21, then he would have derived citizenship from her. From her. But that question was raised. But I just presume from the absence of response from Aliens Counsel that she had not naturalized because they'd certainly be pursuing that if she had. Well, we don't know for sure. Now, how old was the lieutenant when he died? Your Honor, that information was in the record. You don't have it on hand. No, I don't. How many years had he served in the Navy? I don't think that was in the record either, Your Honor. I mean, I think he was in the neighborhood of 50 or more or less when he died. But that's just a very rough number. And whether he continued to stay in the military, that's not in the record.  Your Honor, what I'm curious about is whether when he retired, he retired with a pension. And then if so, by making certain payments, having a certain amount of money taken out of his retirement compensation, his wife would receive survivor's benefits in the event of his death. And what I'm wondering about is whether this young man is considered or was considered one of his beneficiaries and whether the Navy requires proof of a blood relationship. From what I remember from my own military papers, Your Honor, I designated my beneficiaries. But there's nothing in the record to indicate that by law he would have been designated. What branch of the service did you retire from? I served in the Navy, Your Honor. Well, I'm retired from the Marine Corps. And so I know a little bit about this. I've been retired since December 31, 1946. And that was right after the Civil War. And so we designated him. That's what I wonder. If he retired with pay and if his wife was a beneficiary and if his boy was a beneficiary. But I think we're talking about something completely different there, Your Honor. Congress has spoken to the issue of citizenship and has seen the need for a blood relationship. I know that. I know that. I'm just thinking about it. So you know we need time. Yes, sir.  Okay. Thanks a lot. Thank you, Your Honor. Commissioner of the Court, may I have a quick rebuttal? Okay. There are three statements that my co-counsel or that my opposing counsel made. The first is where he said that the plea agreement is dispositive, but under page 307, paragraph 4, it says this agreement serves to amend the complaint to allege the offense to which defendant pleads without the filing of any additional pleading. On page 309, the offense to which he pleads, then, is clearly marked, which is simply sale or transportation of dangerous drugs. The actual drug is omitted. And unique to this statute, there is this isn't simply a question where the information conflicts with the plea agreement and the judgment. But what he's saying is you have to read that in conjunction with the complaint, and it refers to count one, and count one specifically mentions meth. Correct. But the plea agreement says that that is the that amendment has been superseded and amended by this plea agreement with no further filings. And then the actual, if you look at 309, it actually then restates the actual new indictment, which doesn't mention the drug at all. The second area of misstatement is Your argument is it just wipes out the original Correct. The count one of the original indictment. Correct. And substitutes for that count one, the count that they filed an amended indictment or a superseding indictment. Actually, under Arizona law, just like California law, oral amendments are adequate. You don't need any paper. All right. So that took care of it. Yeah. The second misstatement is that the opposing counsel said that Mr. Anderson never raised the legitimation statutes to the BIA. In page 28 to 35 of the record is Mr. Anderson's brief to the BIA where it lists the statute of all three jurisdictions. The BIA considered this in footnote one and simply said he didn't need it because they require biology. They never cited the statutes. And if you look at each of the statutes, the Philippine requires marriage, birth certificate, paternity affidavit, which is met. California says conduct and marriage, which was met. Arizona says birth certificate, affidavit of paternity, and that's met. And what's unique about Arizona is that there's a saying that there are no bastards in Arizona, that once you establish paternity, you automatically become legitimated under Arizona law. And Mr. Anderson met all of that. There's no basis for a blood relationship to be written into state law, especially by the BIA, which has no expertise in that area. And then on the third issue, just to echo Judge Wardlaw's comments, Martinez-Mendera was the case that you mentioned that cited the wrong statute and footnote one cites the wrong statute. And back to a question that you asked, Judge Pregerson, is that I think what's important about this case is that the legitimation statutes, as quoted by the Georgia Supreme Court in our case, were meant to bind families together. They were meant to tie families together. It's an improper use to take away a child out of a preexisting family. Well, what do we make of the BIA's statement that we can find no support for respondent's contention that Filipino law does not require a biological link between a parent or his offspring? And it says, it constitutes the Philippines, says forth, two methods for the establishment of the parent-child relationship, nature or adoption. What's your rebuttal to that if you go under Philippine law? We would contend that the statute that we cited doesn't list biology and doesn't list that requirement expressly. So we contend that that can't be written in. But even if the Court disagrees with us on the Philippines, we still win on the Arizona and California statutes. And opposing counsel said that California law requires a blood relationship, which is dicta only from the Martinez-Mendera case. But Judge Thomas' dissent in Martinez-Mendera points out the error of that analysis, of that dicta. In particular, Martinez-Mendera was relying on a case from 1872 saying that blood tie had to be proven. But as we showed in the law review article, blood tests weren't even admissible or even invented until the 1930s. So that has to be in the statement of law. And we contend that Judge Thomas got that right in his dissent regarding the section number 230. Sidney Thomas. Pardon? Sidney Thomas. Yes, Your Honor. You just made reference, and I think you addressed me, to a particular case just a minute ago. The Martinez-Mendera case and the dissenting? No, before that. Oh, there's a Georgia State Supreme Court case. Oh, Georgia. And that is in our opening brief and in our reply brief. And that talks about the role of legitimation statutes, because in that situation it's a custody situation where either the father was trying to get at a child with companions or the mother wanted to get the father off just to be able to take control of the child. And Georgia said that's against public policy, that legitimation statutes have to bind the child and they can't be used to take away a child. Okay. Are there any further questions? Can you just tell me which particular section of the Family Code of the Philippines that you rely on for no requirement of blood relation? Yes, Your Honor. It is cited in our brief. It's Article 178, Title VI, Chapter 4. It has four different requirements. And then also the Family Code that we cite simply says, legitimation shall take place by subsequent valid marriage between parents. And we can send out that wording under the Family Code in conjunction with the Article 178. It does not show any biological tie. And this was before the BIA? Yes, Your Honor. And from 20 to 35, all three jurisdictions, all their statutes were cited, and these arguments were made to the BIA and the BIA dismissed all of them. Yeah. Well, you know, these legitimation statutes would have helped Alexander Hamilton. How so? Well, you have to read your history. Thank you. Thank you very much. All right.
judges: Zouhary, Pregerson, Wardlaw